

FILED by __SL__ D.C.

**Dec 22, 2016**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. –MIAMI

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

CASE NO. ___**16-20967-CR-WILLIAMS/SIMONTON**___

18 U.S.C. § 371
18 U.S.C. § 2

UNITED STATES OF AMERICA

v.

TEVA LLC,

        **Defendant.**

_____/

## INFORMATION

    The United States charges that, at all times relevant to this Information, unless otherwise specified:

### GENERAL ALLEGATIONS

### Relevant Statutory Background

    1.    The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, et seq. ("FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

### Relevant Entities and Individuals

    2.    Teva Pharmaceutical Industries Ltd. ("Teva") was an Israeli limited liability company with its headquarters in Petah Tikva, Israel.  Teva was the world's largest manufacturer

of generic pharmaceutical products. Teva also manufactured patented pharmaceutical products, including Copaxone, which was used in the treatment of multiple sclerosis. Teva owned and controlled numerous consolidated subsidiaries through which it marketed and sold pharmaceutical products in various countries around the world. Teva's American Depository Receipts ("ADRs") were traded on the Nasdaq National Market from October 1987 until May 2012, when Teva's ADRs began to be traded on the New York Stock Exchange ("NYSE"). Accordingly, since October 1987, Teva has been an "issuer" as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-1(a) and 78m(b).

3.       TEVA LLC ("TEVA RUSSIA") was a limited liability company incorporated in the Russian Federation in 2010 and was a wholly-owned subsidiary of Teva. TEVA RUSSIA, and its predecessor entities, operated on behalf, for the benefit, and under the control of Teva, and was principally responsible for the sale and marketing of Teva pharmaceutical products in Russia.   TEVA RUSSIA was an "agent" of an issuer, Teva, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

4.       Teva International Group ("TIG") was a unit of Teva that was principally responsible for overseeing Teva's operations in regions outside of the United States and Western Europe, including in the Russian Federation. TIG was in operation from in or about 2002 until in or about mid-2010, at which point Teva underwent a corporate reorganization and TIG's responsibilities were absorbed by other Teva units.

5.       "Teva Executive," an Israeli citizen whose identity is known to the United States and the Company, was the senior Teva executive responsible for overseeing TIG between 2002 and 2010, and left the Company in 2014. Teva Executive was an "officer," "director,"

"employee," and "agent" of an issuer, Teva, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

6.      "Teva Russia Executive," a citizen of the Russian Federation whose identity is known to the United States and the Company, was a high-level executive at TEVA RUSSIA from in or about January 2006 until he left TEVA RUSSIA in or about September 2012.  Teva Russia Executive was an "agent" of an issuer, Teva, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

7.      "Russian Official," a citizen of the Russian Federation whose identity is known to the United States and the Company, was a high-ranking government official in the Russian Federation, who held official positions on government committees.  By virtue of his official position, Russian Official had the ability to influence matters related to the purchase of pharmaceutical products by the Russian government, including purchases made during annual auctions held by the Russian Ministry of Health.  Russian Official was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, 78dd-1(f)(1)(A).

8.      "Russian Company" was a group of companies incorporated in the Russian Federation, the identity of which is known to the United States and the Company.  Russian Company was a distributor, manufacturer and re-packager of pharmaceutical products in the Russian Federation.  Russian Company was owned, controlled and managed by Russian Official. From at least in or about 2003 until at least 2013, Russian Company's controlling shares were held in the name of Russian Official's spouse, who was not involved in Russian Company's business operations.

3

**Background on Teva Pharmaceutical Sales in the Russian Federation**

9.      The manufacture, registration, distribution, sale and prescription of pharmaceuticals were highly-regulated activities throughout the world. Countries typically established regulatory schemes that required, among other things, the registration of pharmaceuticals. In certain countries, including the Russian Federation, government entities were responsible for selecting which pharmaceuticals would be purchased by government institutions or ministries and for approving which pharmaceuticals would be eligible for government reimbursement.

10.      Copaxone was the brand-name of glatiramer acetate, a drug used in the treatment of multiple sclerosis, and was one of the few non-generic products sold by Teva. A yearly prescription of Copaxone, which patients were required to take as a once-daily injection, cost up to tens of thousands of dollars. During the relevant time period, Copaxone was Teva's most profitable product.

11.      The Russian Federation had a socialized public healthcare system that provided universal healthcare to Russian citizens, with the cost of medical care and drug treatments shared between the central, regional and local governments. In or around late 2007, the Ministry of Health designated seven illnesses and conditions as rare and expensive to treat and created a program whereby the central government would procure and supply to patients the necessary medications for treating these illnesses and conditions. Among the covered illnesses was multiple sclerosis and treatment by Copaxone. Since in or around 2008, Russian government purchases of Copaxone were primarily made by the Ministry of Health at usually bi-annual auctions.

4

## The Unlawful Schemes

12.     From 2006 through at least 2012, TEVA RUSSIA, through its employees and agents, together with others, agreed that TEVA RUSSIA would make corrupt payments to Russian Official, intending that Russian Official would use his official position and ability to influence the Russian government to purchase Copaxone through tender offers.  The payments were made through the high profit margins that Russian Company earned as Teva's repackager and distributor of Copaxone for sales to the Russian Ministry of Health pursuant to the central government's drug purchase program.

13.     In furtherance of the scheme in Russia, employees and agents of TEVA RUSSIA sent emails through the United States.

14.     Employees of Teva, based in Israel, and employees of TEVA RUSSIA, at the direction of Teva Executive and others, sought to increase sales of Copaxone to the Russian government, including by doing business with companies owned and controlled by Russian Official, knowing that he was a high-level Russian government official at the time.

15.     On or about October 26, 2006, Teva Russia Executive emailed Teva Executive and another senior TIG Manager about a recent meeting with Russian Official, providing them with "an idea of the caliber of the person [by] citing below just a few of his formal titles and personal achievements."[1]  Teva Russia Executive described Russian Official's official position and explained that Russian Official was "the key lobbyist of pharma-related questions and issues" as well as a "key contact person for Knesset," the Israeli parliament.  Teva Russia Executive explained that Russian Official was the "owner of the local wholesaling company

---

[1] Unless bracketed, all quotations appear as in the original document without corrections or indications of misspellings or typographical errors.

[Russian Company]" along with several other pharmaceutical companies.  Teva Russia Executive's email further noted that Russian Official's "influence in the industry" could benefit Teva by, among other things, allowing Teva to obtain "more speedy and straightforward registration of products."  Teva Russia Executive cautioned, however, that "the results [of Russia's] 2008 presidential elections can affect the status and scope of [Russian Official]'s influence."

16.     On or about October 26, 2006, Teva Executive replied to Teva Russia Executive that he "support[ed] exploring any kind of initiative which could strengthen our position in Russia."

17.     On or about February 8, 2008, Teva Russia Executive sent Teva Executive an email attaching a report about Russian Company.  In a section of the report detailing Russian Company's "management and corporate governance," Teva Russia Executive explained that "[t]ransparency of [Russian Company] should be considered low....  Participation of [Russian Official] and probably some local government officials in the ownership structure is well-known."

18.     In or about early October 2008, Teva managers, including Teva Executive, met with Russian Official and a Russian Company executive in Israel.  The meeting had been arranged by Russian Company's Director of Sales and Marketing.

19.     On or about October 7, 2008, Russian Company's Director of Sales and Marketing emailed Teva Executive to follow-up on matters discussed during the meeting.  The email reiterated that Russian Company was "interested to participate in the delivery and distribution of Copaxone," and explained that the Russian government had already "defined" the government's order for Copaxone for 2009.  The email also mentioned possible "future

scenarios" that could affect the "decision making" related to Copaxone sales, reminded Teva Executive that Russian Official had had "personal involvement … in the introduction of Copaxone and other important healthcare initiatives in Russia," and explained that "it will be beneficial for Teva to grant the distribution of Copaxone to [Russian Company] in full or partially."

20.     Between in or around October 2008 and in or around January 2009, Teva employees, including Teva Executive, learned that the Russian Company executive was under investigation in Russia for corruption and that Teva's risk insurance provider had decided to stop insuring transactions with Russian Company.

21.     In or around late 2008 or early 2009, after the meeting and email described in Paragraphs 18 and 19, Teva Executive, Teva Russia Executive, and others agreed that Teva would grant Russian Company the right to distribute Copaxone in Russia, intending that Russian Official would use his official position and ability to influence to increase sales of Copaxone to the Russian government.  From early 2009 until in or about mid-2010, Teva employees explored various possibilities for Russian Company to sell Copaxone.

22.     On or about March 7, 2009, Russian Company's Director of Sales and Marketing emailed Teva Executive with information about a public tender for the purchase of Copaxone that had been announced by the Russian Academy of Medical Sciences ("RAMS").  The email explained that Russian Company's "top management has first hand relations with RAMS" and that the tender offered "a very good chance to push further up Copaxone positioning in Russia, since RAMS and its President have [a] significant role in influencing the opinion of medical and political stratum in Russia."

23.     On or about March 8, 2009, Teva Executive forwarded the foregoing email to a senior TIG executive with the note, "[t]his is an interesting offer as this is [Russian Official]'s domain/specialty.  Pls look into this and advise soonest."

24.     On or about March 10, 2009, the senior TIG executive forwarded Teva Executive's email to Teva Russia Executive, who confirmed that Russian Company had "a strong position in this establishment." Teva Russia Executive explained that he was aware of the issue and was already dealing with a Russian Company employee who "reports directly to [Russian Official]." In or around mid-2009, the Russian government announced a new strategy for the Russian Federation's domestic pharmaceutical industry, known as "Pharma 2020." The goals of the new strategy involved, among other things, an import phase-out and changes to the procurement of pharmaceutical products, primarily by establishing a preference for domestic products.  These changes started to apply in early 2009 and affected purchases made through the Russian government's annual procurement auction program.  Under the law, as announced, repackaging of a foreign pharmaceutical product inside the Russian Federation could qualify for the domestic preference under Pharma 2020.

25.     In or around mid-2010, Teva reorganized its business and eliminated the TIG business unit. TEVA RUSSIA was put under the newly-created EMIA business unit.

26.     In or around mid-2010, TEVA RUSSIA employees, including Teva Russia Executive, agreed with Russian Official and others on a plan for Russian Company to be Teva's repackager and distributor for Copaxone sales to the Russian government.  Russian Company would repackage and distribute Copaxone on behalf of Teva.  As set forth below, Teva hoped that Russian Official would use his political network and official influence to benefit Teva to support maintaining or increasing the amount of Copaxone sold to the Russian government.

27.     In or around early August 2010, a Russian Company employee emailed Teva Russia Executive to request that Russian Company receive a larger discount on sales to a Russian government customer.  On or about August 5, 2010, Teva Russia Executive forwarded the complaint to the manager of TEVA RUSSIA's Innovative Business Unit, requesting that Russian Company be granted a larger discount.  The TEVA RUSSIA manager opposed giving Russian Company "any additional concessions," but Teva Russia Executive wrote back, suggesting that TEVA RUSSIA should consider the request as "the cost of building a relationship with [Russian Official]," as "this year, there was a substantial increase in the Copaxone requests from the [RAMS]," and TEVA RUSSIA "may benefit from [Russian Official's] support in other areas as well."

28.     In or around late August 2010, TEVA RUSSIA employees provided a draft of the proposed Copaxone repackaging and distribution agreement between Teva and Russian Company to Teva employees in Israel.

29.     On or about September 12, 2010, a TEVA RUSSIA executive emailed the Finance Director for Teva's Copaxone business unit and other Teva managers and executives in Israel to provide the "rationale for the new scheme of Copaxone business in Russia."  The email explained that "this year the Russian Government has been contining to interfere into pharmaceutical market functioning.  Thus it has been continuing its pressure on prices especially on those products that being of high price are paid by the state budget."  The email further explained that the focus of this price pressure had been "expensive imported products paid by the government," including Copaxone, and that the Russian government was seeking to "encourage[] competition intensification by both fast track registration of the new competing products (one was registered this summer for MS treatment and we expect it takes part in the MS

9

tender this fall) and supporting fast development and introduction of the local glatiramoids (they call them, of course, 'Copaxone's generics')."  In the email, the TEVA RUSSIA executive stated that this "and some other new factors produced a serious threats for the Copaxone business in 2011."  As a result, "partnership with a robust influential local player was identified as the proper solution to the above challenges."  The email stated that the partner was "supposed to lobby Copaxone in the state tender."  He explained that Russian Company "was found as the right company capable to assure keeping Copaxone's share and its price and even r[a]ising them both up."

30.     In his email to Teva executives, the TEVA RUSSIA executive asked for their approval of the proposed Russian Company repackaging and distribution agreement "as soon as possible."  The email explained that "if we do not have the supply agreement approved and signed by [the] mid[dle] of this week we will encounter very real threat of losing a 100 million USD Copaxone business in 2011."

31.     On or about September 12, 2010, a TEVA RUSSIA manager emailed Teva executives in Israel with additional information supporting TEVA RUSSIA's request.  The email noted that Russian Company was headed by Russian Official, listed Russian Official's official positions on various government committees, and explained that "the plan" was to use Russian Official's contacts, including at the Ministry of Health, to maintain Copaxone's share of the market, including by minimizing the risk that a generic version of Copaxone would be approved by the Russian government, thereby reducing Teva's market share.

32.     On or about September 12 and 13, 2010, Teva Russia Executive sent emails to senior Teva executives in Israel requesting them to sign off on the agreement with Russian Company immediately.

33.     On or about September 14, 2010, a TEVA RUSSIA senior manager emailed Teva Russia Executive and described a meeting he had just had with Russian Official. The email said that Russian Official had told him that the Minister of Health "had returned from a vacation and asked in the morning if there was a confirmation that the entire project … would take place." The email explained that Russian Official was concerned that Teva would refuse to approve the agreement with Russian Company, and that Russian Official had threatened that "both the price and the supply volumes would be purposefully 'lowered' if a partnership with him was not established."

34.     On or about September 15, 2010, Teva executives agreed to enter into the Copaxone repackaging and distribution agreement with Russian Company.

35.     On or about October 7, 2010, TEVA RUSSIA's Legal Director initiated the internal process to formally enter into the agreement with Russian Company. Consistent with Teva's anti-corruption policy as it related to third-party agreements, the Legal Director submitted a completed questionnaire about the Russian Company agreement to Teva for review and approval. In transmitting the materials, the Legal Director stated that the "deal value is about US$ 100 million for 2011 sales" and asked for immediate review, calling the deal "rather urgent." The email and supporting information stated that Russian Official's wife was the owner of the company but did not include that Russian Official ran the business. The email also omitted facts known to Teva Russia Executive and other TEVA RUSSIA employees, including details about the corruption investigation by Russian authorities against the Russian Company executive and information from Russian news media reports on Russian Official's alleged involvement in corruption related to Russian government drug procurement auctions going back to 2006.

11

36.     On or about October 8, 2010, a Teva Finance Department manager with responsibility for approving compliance-related requests for the EMIA region directed a Finance employee to forward the compliance questionnaire concerning the Russian Company agreement to the Regional Compliance Officer and to TEVA RUSSIA's CFO for, among other things, due diligence to be conducted.

37.     On or about October 9, 2010, in response to an inquiry about the status of due diligence on Russian Company, a senior EMIA executive sent an email to another high-ranking EMIA executive explaining that Teva Russia Executive would be leading the due diligence process.  As set forth above, at the time, Teva Russia Executive had been pushing for the agreement between TEVA RUSSIA and Russian Company.

38.     On or about October 21, 2010, the EMIA Regional Compliance Officer approved the agreement between Teva and Russian Company.

39.     On or about October 28, 2010, Teva executed the framework agreement with Russian Company, which included granting Russian Company the right to repackage and distribute Copaxone in the Russian Federation as well as an incentive agreement with payments tied to increasing sales targets.  At the same time Teva entered into the distribution agreement with Russian Company, Teva terminated an agreement with the Russian company that had distributed Copaxone at several prior Ministry of Health auctions and agreed to pay that company a substantial "bonus" payment as part of the termination.

40.     On or about November 12, 2010, the Russian Ministry of Health awarded Russian Company the contract to supply the Russian government with glatiramer acetate for its tender.

12

41.     On or about December 13, 2010, a TEVA RUSSIA executive communicated via email with a senior manager at Russian Company regarding matters related to the recently-awarded contract to supply Copaxone to the Russian government.

42.     On or about December 30, 2010, Teva Russia Executive emailed a senior EMIA executive about a meeting the executive was scheduled to have with Russian Official.  In preparing the executive for the meeting, Teva Russia Executive explained Russian Official's position and influence in the Russian government and stated that the "state channel is a key one for his businesses."  Teva Russia Executive explained that "the dilemma [Russian Official] faces is how to protect his positions under conditions when state funded business in Russia is becoming transparent."  Among other things, Teva Russia Executive asked the senior EMIA executive to "push [Russian Official] to demand more funding for Copaxone [] in early 2011" and to "obtain his commitment in protecting Copaxone (access to the Minister [of Health] and [Ministry of Health] decision makers, leveraging Senate capabilities)."

43.     On or about January 2, 2011, the senior EMIA executive emailed Teva Russia Executive about his meeting with Russian Official, stating that Russian Official "strongly encourages us to strengthen our influence with Regional Government Neurologist Representatives, to ensure in the future Copaxone volumes are protected."

44.     On or about January 24, 2012, Russian Company was awarded another contract by the Russian Ministry of Health to supply the government with Copaxone.

45.     Teva terminated its repackaging and distribution relationship with Russian Official and Russian Company in the middle of 2013 as a result of Russian Company's refusal to follow Teva's due diligence procedures.

13

46.     During the time that Russian Company was Teva's repackager and distributor for Copaxone, Teva earned profits of approximately $204,167,303 on sales made by Russian Company to the Russian government.

## COUNT ONE
### (Conspiracy to Violate the FCPA)

47.     Paragraphs 1 through 46 are realleged and incorporated by reference as though fully set forth herein.

48.     From at least in or around 2006 through at least in or around 2012, in the Southern District of Florida and elsewhere, TEVA RUSSIA, the defendant, together with Teva Executive, Teva Russia Executive, and others known and unknown to the United States, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, that is, as an agent of an issuer, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised, directly and indirectly, to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Teva and TEVA RUSSIA in obtaining and retaining business for and with, and directing

14

business to, Teva, TEVA RUSSIA and others, in violation of Title 15, United States Code, Section 78dd-1(a).

## Object of the Conspiracy

49.     The object of the conspiracy was to secure and increase sales of Copaxone to the Russian Ministry of Health by making corrupt payments to Russian Official, a foreign official.

## Manner and Means of the Conspiracy

50.     The manner and means by which TEVA RUSSIA and its coconspirators sought to accomplish the purposes of the conspiracy included, among other things, the following:

a.      TEVA RUSSIA, through certain of its employees and agents, sought to have Teva enter into a distribution agreement with Russian Company intending that Russian Official would exercise his influence to increase Copaxone sales.

b.      Employees and agents of TEVA RUSSIA concealed negative information about Russian Company when Teva was undertaking due diligence, including information about Russian Official's alleged involvement in corruption related to Russian government drug procurement auctions.

c.      TEVA RUSSIA, through its employees and agents, entered into an agreement with Russian Company whereby Russian Company became Teva's repackager and distributor of Copaxone in sales of the drug to the Russian government.

d.      TEVA RUSSIA, through its employees and agents, together with others, paid or caused to be paid more than $65 million in profits to Russian Company in connection with sales of Copaxone to the Russian government, intending that some or all of the monies be given to Russian Official and others.

15

**Overt Acts**

51.     In furtherance of the conspiracy and to achieve its purpose and object, at least one of the coconspirators committed, and caused to be committed, in the United States, and elsewhere, the following overt acts, among others:

a.     On or about October 7, 2008, Russian Company's Director of Sales and Marketing sent an email to Teva Executive memorializing a recent meeting with Russian Official and others, which explained that "it will be beneficial for Teva to grant the distribution of Copaxone to [Russian Company] in full or partially."

b.     On or about March 8, 2009, Teva Executive sent an email to Teva Russia Executive, an executive of the TEVA RUSSIA, and others, instructing Teva Russia Executive to explore entering into an agreement with Russian Company to sell Copaxone in an upcoming Russian government tender.

c.     On or about August 5, 2010, Teva Russia Executive sent an email to an employee of TEVA RUSSIA instructing him to grant Russian Company an increased profit margin on sales of Copaxone to the Russian government, explaining that this should be considered "the cost of building a relationship with [Russian Official]."

d.     In or around late August 2010, TEVA RUSSIA employees provided a draft of the proposed Copaxone distribution agreement between Teva and Russian Company to Teva employees in Israel.

e.     On or about September 12, 2010, a TEVA RUSSIA manager emailed Teva executives in Israel with additional information about the proposed distribution agreement, noting that Russian Company was headed by Russian Official, listing the official positions held

16

by Russian Official on various government committees, and explaining that "the plan" was to use the official positions held by Russian Official to maintain Copaxone's share of the market.

      f.      On or about October 28, 2010, Teva executed the framework agreement with Russian Company, which included granting Russian Company the right to distribute Copaxone in the Russian Federation as well as an incentive agreement with payments tied to increasing sales targets.

      g.      On or about December 13, 2010, a TEVA RUSSIA executive communicated via email with a senior manager at Russian Company regarding matters related to the recently-awarded contract to supply Copaxone to the Russian government.

      h.      On or about December 30, 2010, Teva Russia Executive emailed a senior Teva EMIA executive about a meeting the executive was scheduled to have with Russian Official.  Among other things, Teva Russia Executive asked the executive to "push [Russian Official] to demand more funding for Copaxone [] in early 2011" and to "obtain his commitment in protecting Copaxone (access to the Minister [of Health] and [Ministry of Health] decision makers, leveraging Senate capabilities)."

      All in violation of Title 18, United States Code, Section 371.

                    ANDREW WEISSMANN
                    Chief, Fraud Section

BY: _____

                    ROHAN A. VIRGINKAR
                    JOHN-ALEX ROMANO
                    Trial Attorneys, Fraud Section
                    Criminal Division
                    United States Department of Justice
                    1400 New York Ave., N.W.
                    Washington, D.C. 20005
                    (202) 598-2253

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA

vs.

TEVA LLC (RUSSIA),

                    **Defendant.**

_____ /

CASE NO. _____

**CERTIFICATE OF TRIAL ATTORNEY\***

**Superseding Case Information:**

| | | | |
|---|---|---|---|
| New Defendant(s) | Yes | _____ | No _____ |
| Number of New Defendants | | _____ | |
| Total number of counts | | _____ | |

**Court Division:** (Select One)

| | | | | |
|---|---|---|---|---|
| X | Miami | _____ | Key West | |
| _____ | FTL | _____ | WPB | _____ FTP |

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:     (Yes or No)     No
   List language and/or dialect _____

4. This case will take     0     days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)

   | | | | (Check only one) | |
   |---|---|---|---|---|
   | I | 0  to  5 days | X | Petty | |
   | II | 6  to 10 days | _____ | Minor | _____ |
   | III | 11 to 20 days | _____ | Misdem. | |
   | IV | 21 to 60 days | _____ | Felony | X |
   | V | 61 days and over | _____ | | |

6. Has this case been previously filed in this District Court?   (Yes or No)   No
   If yes:
   Judge:                          Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter?          (Yes or No)   No
   If yes:
   Magistrate Case No. _____
   Related Miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the District of _____
   Is this a potential death penalty case? (Yes or No)          No

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?     Yes _____     No  X

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?     Yes _____     No  X

_____
ROHAN A. VIRGINKAR
TRIAL ATTORNEY, DEPT OF JUSTICE
CRIMINAL DIVISION

\*Penalty Sheet(s) attached

REV 4/8/08

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name**:   **Teva LLC (Russia)**

**Case No**:

Count #: 1                Conspiracy to Violate the Foreign Corrupt Practices Act

                          18 U.S.C. § 371

**\* Max. Penalty**:      Fine of up to $500,000 or Twice the Gross Gain

Count #: 2



**\*Max. Penalty:**

Count #:



**\*Max. Penalty:**

Count #:



**\*Max. Penalty:**

Count #:



**\*Max. Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| Teva LLC | ) | |
| | ) | |
| _____ | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year.  I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date:    _12/22/2016_

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

Martin J. Weinstein
_____
*Printed name of defendant's attorney*


_____
*Judge's signature*

_____
*Judge's printed name and title*