UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. _____ |
| v. | VIOLATION: |
| TEVA LLC (RUSSIA) | 18 U.S.C. § 371 |

**PLEA AGREEMENT**

The United States of America, by and through the Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), and the Defendant, Teva LLC (Russia) ("Teva Russia" or the "Defendant"), by and through its undersigned attorneys, pursuant to authority granted through its General Members Meeting, hereby submit and enter into this plea agreement (the "Agreement"), pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. The terms and conditions of this Agreement are as follows:

**The Defendant's Agreement**

1.      Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Defendant agrees to waive its right to grand jury indictment and its right to challenge venue in the District Court for the Southern District of Florida, and to plead guilty to a one-count criminal Information charging the Defendant with conspiracy to violate the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Section 78dd-1, in violation of Title 18, United States Code, Section 371. The Defendant further agrees to persist in that plea through sentencing and, as set forth below, to cooperate fully with the Fraud Section in its investigation into all matters related to the conduct charged in the Information.

2.      The Defendant understands that, to be guilty of these offenses, the following essential elements of the offense must be satisfied:

a.      The Defendant was an agent acting on behalf of an issuer of a security registered pursuant to Title 15, United States Code, Section 78l during the relevant time period;

b.      An unlawful agreement between two or more individuals to violate the FCPA existed; specifically, to corruptly make use of the mails and means and instrumentalities of interstate commerce in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist defendant and his co-conspirators in obtaining and retaining business for and with, and directing business to, their employer and others;

c.      The Defendant knowingly and willfully entered that conspiracy;

d.      One of the members of the conspiracy knowingly committed, in the Southern District of Florida or elsewhere in the United States, at least one of the overt acts charged in the Information; and

2

e.      The overt acts were committed to further some objective of the conspiracy.

3.      The Defendant understands and agrees that this Agreement is between the Fraud Section and the Defendant and does not bind any other division or section of the Department of Justice or any other federal, state, or local prosecuting, administrative, or regulatory authority. Nevertheless, the Fraud Section will bring this Agreement and the nature and quality of the conduct, cooperation and remediation of the Defendant, its direct or indirect affiliates, subsidiaries, and joint ventures, to the attention of other prosecuting authorities or other agencies, as well as debarment authorities and Multilateral Development Banks ("MDBs"), if requested by the Defendant.

4.      The Defendant agrees that this Agreement will be executed by an authorized corporate representative. The Defendant further agrees that a resolution duly adopted through the Defendant's General Members Meeting in the form attached to this Agreement as Exhibit 1, authorizes the Defendant to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant and its counsel are authorized through the Defendant's General Members Meeting, on behalf of the Defendant.

5.      The Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement.

6.      The Fraud Section enters into this Agreement based on the individual facts and circumstances presented by this case including:

a.      Teva Pharmaceutical Industries Ltd. (the "Company") did not timely voluntarily self-disclose the FCPA violations to the Fraud Section, and as a result the Company and the Defendant were not eligible for a more significant discount on the fine amount or the form of resolution;

3

b.      The Defendant received credit for cooperation with the Fraud Section's investigation provided by the Defendant and the Company, including voluntarily making U.S. and foreign employees available for interviews; at the request of the government in certain limited circumstances, deferring personnel actions in order to allow U.S. and foreign employees to be available for interviews, and deferring witness interviews to de-conflict with the Fraud Section's investigation; collecting, analyzing, translating and organizing voluminous evidence from multiple jurisdictions; providing updates to the Fraud Section as to the conduct and results of the Company's internal investigation; providing all non-privileged facts relating to individual involvement in the conduct described in the Statement of Facts and conduct disclosed to the Fraud Section prior to the Agreement; and disclosing to the Fraud Section conduct in Russia and Ukraine of which the Fraud Section was previously unaware.  The Defendant did not receive full credit because of issues that resulted in delays to the early stages of the investigation, including vastly overbroad assertions of attorney-client privilege and not producing documents on a timely basis in response to certain Fraud Section document requests;

c.      The Company and the Defendant engaged in remediation measures, including:  (1) causing at least 15 employees who were involved in the misconduct described in the Statement of the Facts to be removed from the Company, because their employment was terminated, they resigned after being asked to leave, or they voluntarily left once the Company's internal investigation began; (2) enhancing the Company's compliance function by implementing a number of policies and procedures designed to prevent prohibited conduct, including the establishment of a system to monitor transactions with members of the health care community; (3) adopting an improved anti-corruption training program; (4) adopting a standalone third-party due diligence program and terminating business relationships with certain third parties; (5)

4

enhancing the independence of the Company's control functions and establishing an office charged with addressing reports of misconduct; and (6) establishing a dedicated Global Compliance Audit group and strengthening the Company's internal audit and investigations teams

        d.       The Defendant and the Company have committed to continuing to enhance their compliance program and internal controls, including ensuring that they satisfy the minimum elements of the corporate compliance program set forth in Attachment C to the deferred prosecution agreement between the Fraud Section and the Company;

        e.       Although the Defendant and the Company have engaged in remedial efforts, many of their compliance program enhancements are more recent and have accordingly not been tested. Thus the Defendant and the Company have agreed to the imposition of an independent compliance monitor to diminish the risk of reoccurrence of the misconduct;

        f.       Accordingly, after considering (a) through (e) above, the Defendant received an aggregate discount of 20% off of the bottom of the Sentencing Guidelines fine range;

        g.       The nature and seriousness of the offense, including the high-dollar amount of illegal payments paid to foreign officials, conduct in a high-risk jurisdiction, the pervasiveness throughout the Defendant's operations, and the involvement of high-level executives in the criminal conduct described in the Statement of Facts; and

        h.       The Defendant has agreed to continue to cooperate with the Fraud Section in any investigation relating to violations of the FCPA as described in Paragraph 10 below.

     7.       The Defendant agrees to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

        a.       to plead guilty as set forth in this Agreement;

     b.    to abide by all sentencing stipulations contained in this Agreement;

     c.    to appear, through its duly appointed representatives, as ordered for all court appearances, and obey any other ongoing court order in this matter, consistent with all applicable U.S. and foreign laws, procedures, and regulations;

     d.    to commit no further crimes;

     e.    to be truthful at all times with the Court;

     f.    to pay the applicable fine and special assessment; and

     g.    to work with its parent corporation in fulfilling the obligations of the Deferred Prosecution Agreement entered into between Teva Pharmaceutical Industries Ltd., and the Fraud Section in a related matter (the "TPI DPA").

8.    Except as may otherwise be agreed by the parties hereto in connection with a particular transaction, the Defendant agrees that in the event that, during the term of the TPI DPA, the Defendant sells, merges, or transfers all or substantially all of its business operations, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for such sale, merger, transfer, or other change in corporate form provisions binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.  The purchaser or successor in interest must also agree in writing that the Fraud Section's ability to breach under this Agreement is applicable in full force to that entity.  The Company agrees that the failure to include these provisions in the transaction will make any such transaction null and void.

9.    Except as may otherwise be agreed by the parties hereto in connection with a particular transaction, if, during the term of the TPI DPA, the Defendant undertakes any change in corporate form that involves business operations that are material to the Defendant's consolidated

financial statements, as they exist as of the date of this Agreement, whether such transaction is structured as a sale, asset sale, merger, transfer, or other change in corporate form, the Defendant shall provide notice to the Fraud Section at least thirty (30) days prior to undertaking any such change in corporate form including dissolution, in order to give the Fraud Section an opportunity to determine if such change in corporate form would impact the terms or obligations of the Agreement.   If such transaction (or series of transactions) has the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined in the sole discretion of the Fraud Section, it shall be deemed a breach of this Agreement pursuant to Paragraphs 16 through 19 of this Agreement, and the Company agrees that such transaction (or series of transactions) will not be consummated.

10.    The Defendant shall cooperate fully with the Fraud Section in any and all matters relating to the conduct described in this Agreement, the Statement of Facts, and the Information filed pursuant to this Agreement, and other conduct related to corrupt payments, false books, records, and accounts, and the failure to implement adequate internal accounting controls, subject to applicable law and regulations, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the term of the TPI DPA.  At the request of the Fraud Section, the Defendant shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the Multilateral Development Banks ("MDBs"), in any investigation of the Defendant, its parent company or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement, the Statement of Facts, and the Information, and other conduct related to corrupt payments, false books, records, and accounts, and the failure to implement adequate internal accounting controls

under investigation by the Fraud Section during the term of the TPI DPA. The Defendant agrees that its cooperation pursuant to this paragraph, the scope of which is set forth above, shall include, but not be limited to, the following, subject to local law and regulations, including relevant data privacy and national security laws and regulations:

        a.     The Defendant shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or work product doctrine with respect to its activities, those of its parent company and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Defendant has any knowledge or about which the Fraud Section may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant to provide to the Fraud Section, upon request, any document, record or other tangible evidence about which the Fraud Section may inquire of the Defendant.

        b.     Upon request of the Fraud Section, the Defendant shall designate knowledgeable employees, agents or attorneys to provide to the Fraud Section the information and materials described in Paragraph 10(a) above on behalf of the Defendant. It is further understood that the Defendant must at all times provide complete, truthful, and accurate information.

        c.     The Defendant shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section, present or former officers, directors, employees, agents and consultants of the Defendant. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding the matters under investigation.

8

d.     With respect to any information, testimony, documents, records or other tangible evidence provided to the Fraud Section pursuant to this Agreement, the Defendant consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities, including United States authorities and those of a foreign government, as well as the MDBs, of such materials as the Fraud Section, in its sole discretion, shall deem appropriate.

11.     During the term of the TPI DPA, should the Defendant learn of any evidence or allegations of conduct that would be a possible violation of the FCPA anti-bribery or accounting provisions had the conduct occurred within the jurisdiction of the United States, the Defendant shall promptly report such evidence or allegations to the Fraud Section.

12.     As discussed below, in light of the disposition with the Defendant's parent corporation, the parties agree that no fine should be imposed on the Defendant.  The Defendant further agrees to pay the Clerk of the Court for the United States District Court for the Southern District of Florida the mandatory special assessment of $400 per count within ten business days from the date of sentencing.

### The United States' Agreement

13.     In exchange for the guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, and in exchange for the agreement of the Defendant's parent corporation, Teva Pharmaceutical Industries Ltd., to assume all of the obligations set forth in the TPI DPA, the Fraud Section agrees it will not file additional criminal charges against the Defendant or any of its direct or indirect parent corporations, affiliates, subsidiaries, or joint ventures, or any predecessor, successor or assign thereof, relating to any of the conduct described in this Agreement, in the Statement of Facts or the Information filed pursuant to this Agreement.

9

This Paragraph does not provide any protection against prosecution for any crimes, including corrupt payments or related false books and records and failure to implement adequate internal accounting controls, made in the future by the Defendant or by any of its officers, directors, employees, agents or consultants, whether or not disclosed by the Defendant pursuant to the terms of this Agreement. This Agreement does not close or preclude the investigation or prosecution of any natural persons, including any officers, directors, employees, agents, or consultants of the Defendant or its direct or indirect affiliates, subsidiaries, or joint ventures, who may have been involved in any of the matters set forth in the Information, Statement of Facts, or in any other matters. The Defendant agrees that nothing in this Agreement is intended to release the Defendant from any and all of the Defendant's excise and income tax liabilities and reporting obligations for any and all income not properly reported and/or legally or illegally obtained or derived.

### Factual Basis

14.     The Defendant is pleading guilty because it is guilty of the charges contained in the Information. The Defendant admits, agrees, and stipulates that the factual allegations set forth in the Information and the Statement of Facts are true and correct, that it is responsible for the acts of its officers, directors, employees, and agents described in the Information and the Statement of Facts, and that the Information and the Statement of Facts accurately reflect the Defendant's criminal conduct.

### The Defendant's Waiver of Rights, Including the Right to Appeal

15.     Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn. The Defendant expressly warrants that it has discussed these rules with its counsel and understands them. Solely to the

extent set forth below, the Defendant voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410. Specifically, the Defendant understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Fraud Section has fulfilled all of its obligations under this Agreement and the Court has imposed the agreed-upon sentence, the Defendant nevertheless withdraws its guilty plea.

16. The Defendant is satisfied that the Defendant's attorneys have rendered effective assistance. The Defendant understands that by entering into this agreement, the Defendant surrenders certain rights as provided in this agreement. The Defendant understands that the rights of criminal defendants include the following:

(a)     the right to plead not guilty and to persist in that plea;

(b)     the right to a jury trial;

(c)     the right to be represented by counsel – and if necessary have the court appoint counsel – at trial and at every other stage of the proceedings;

(d)     the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses; and

(e)     pursuant to Title 18, United States Code, Section 3742, the right to appeal the sentence imposed.

Nonetheless, the Defendant knowingly waives the right to appeal or collaterally attack the conviction and any sentence within the statutory maximum described below (or the manner in which that sentence was determined) on the grounds set forth in Title 18, United States Code,

Section 3742, or on any ground whatsoever except those specifically excluded in this Paragraph, in exchange for the concessions made by the United States in this plea agreement. This agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b). The Defendant also knowingly waives the right to bring any collateral challenge challenging either the conviction or the sentence imposed in this case. The Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a. The Defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution related to the conduct described in the Statement of Facts or the Information, including any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the Defendant violates this Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of agreement, or withdrawal of plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed. The Fraud Section is free to take any position on appeal or any other post-judgment matter. The parties agree that any challenge to the Defendant's sentence that is not foreclosed by this Paragraph will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the Defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

12

## Penalty

17.     The statutory maximum sentence that the Court can impose on a corporate entity for a violation of Title 18, United States Code, Section 371, is a fine of $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest, Title 18 United States Code, Section 3571 (c)(3), (d); five years' probation, Title 18, United States Code, Section 3561(c)(1); and a mandatory special assessment of $400 per count, Title 18, United States Code, Section 3013(a)(2)(B).

## Sentencing Recommendation

18.     The parties agree that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory sentencing guideline range pursuant to the United States Sentencing Guidelines.  The Court will then determine a reasonable sentence within the statutory range after considering the advisory sentencing guideline range and the factors listed in Title 18, United States Code, Section 3553(a).  The parties' agreement herein to any guideline sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof.  The Defendant also understands that if the Court accepts this Agreement, the Court is bound by the Guidelines calculations in Paragraph 19.

19.     The Fraud Section and the Defendant agree that a faithful application of the United States Sentencing Guidelines (U.S.S.G.) to determine the applicable fine range yields the following analysis:

      a.     The 2015 U.S.S.G. are applicable to this matter.

      b.     Offense Level.  Based upon U.S.S.G. § 2C1.1, the total offense level is 44, calculated as follows:

          (a)(2)   Base Offense Level                      12

| | | |
|---|---|---|
| (b)(1) | Multiple Bribes | +2 |
| (b)(2) | Value of benefit received more than $150,000,000 | +26 |
| (b)(3) | High-level Official Involved | +4 |
| **TOTAL** | | 44 |

c.    <u>Base Fine</u>. Based upon U.S.S.G. § 8C2.4(a)(2), the base fine is $204,167,303 (as the pecuniary gain exceeds the fine indicated in the Offense Level Fine Table, namely $72,500,000)

d.    <u>Culpability Score</u>. Based upon U.S.S.G. § 8C2.5, the culpability score is 6, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(3) | the unit of the organization within which the offense was committed had 200 or more employees and an individual within high-level personnel of the unit participated in, condoned, or was willfully ignorant of the offense | +3 |
| (g)(2) | The organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | - 2 |
| **TOTAL** | | 6 |

<u>Calculation of Fine Range</u>:

| | |
|---|---|
| Base Fine | $204,167,303 |
| Multipliers | 1.20 (min)/ 2.40 (max) |
| Fine Range | $245,000,763 (min)/ $490,001,527 (max) |

20.    Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Fraud Section and the Defendant agree that the following represents the appropriate disposition of the case:

a.      <u>Disposition</u>.  Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the Defendant agree that the appropriate disposition of this case is as set forth above, and agree to recommend jointly that the Court not impose a criminal fine on the Defendant, conditioned upon a monetary penalty in the amount of $283,177,348 paid by Teva Pharmaceutical Industries Ltd. under the terms specified in the TPI DPA.

b.      <u>Mandatory Special Assessment</u>.  The Defendant shall pay to the Clerk of the Court for the United States District Court for the Southern District of Florida within ten days of the time of sentencing the mandatory special assessment of $400 per count.

21.      This Agreement is presented to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C). The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement contemplated.  The Defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.

22.      If acceptable to the Court, the Defendant and the Fraud Section agree to waive the Presentence Investigation Report pursuant to Fed. R. Crim. P. 32(c), and to request that the defendant be sentenced at the time the guilty plea is entered.  In the event the Court directs the preparation of a Presentence Investigation Report, the Fraud Section will fully inform the preparer of the Presentence Investigation Report and the Court of the facts and law related to the Defendant's case.  In such event, at the time of the plea hearing, the parties will suggest mutually agreeable and convenient dates for the sentencing hearing with adequate time for (a) any objections

15

to the Presentence Report, and (b) consideration by the Court of the Presentence Report and the parties' sentencing submissions.

## Breach of the Plea Agreement

23.     If the Defendant (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraphs 10 and 11 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraph 7 of this Agreement and the Corporate Compliance Program; (e) commits any acts that, had they occurred within the jurisdictional reach of the FCPA, would be a violation of the FCPA; or (f) otherwise fails specifically to perform or to fulfill completely each of the Defendant's obligations under the Agreement, regardless of whether the Fraud Section becomes aware of such a breach after the term specified in Paragraph 7(h) of the Agreement, the Defendant shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section has knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Office in the U.S. District Court for the Southern District of Florida or any other appropriate venue.   Determination of whether the Defendant has breached the Agreement and whether to pursue prosecution of the Defendant shall be in the Fraud Section's sole discretion.   Any such prosecution may be premised on information provided by the Defendant. Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the term described in Paragraph 7(h) of the Agreement plus one year. Thus,

16

by signing this Agreement, the Defendant agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the term described in Paragraph 7(h) of the Agreement plus one year.  The Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement.  In addition, the Defendant agrees that the statute of limitations as to any violation of federal law that occurs during the term of the cooperation obligations provided for in the Paragraph 10 of the Agreement will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section is made aware of the violation or the duration of the term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

24.     In the event the Fraud Section determines that the Defendant has breached this Agreement, the Fraud Section agrees to provide the Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within thirty days of receipt of such notice, the Defendant shall have the opportunity to respond to the Fraud Section in writing to explain the nature and circumstances of such breach, as well as the actions the Defendant has taken to address and remediate the situation, which explanation the Fraud Section shall consider in determining whether to pursue prosecution of the Defendant.

25.     In the event that the Fraud Section determines that the Defendant has breached this Agreement: (a) all statements made by or on behalf of the Defendant to the Fraud Section or to the Court, including the attached Statement of Facts, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section against the Defendant; and (b) the Defendant

shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Defendant, will be imputed to the Defendant for the purpose of determining whether the Defendant has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section.

26.     The Defendant acknowledges that the Fraud Section has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant breaches this Agreement and this matter proceeds to judgment.   The Defendant further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

### Public Statements by the Defendant

27.     The Defendant expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above or the facts described in the Information and the Statement of Facts.  Any such contradictory statement shall, subject to cure rights of the Defendant described below, constitute a breach of this Agreement, and the Defendant thereafter shall be subject to prosecution as set forth in Paragraphs 23 through 26 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the Information or the Statement of Facts will be imputed to the Defendant for the purpose of determining whether

18

it has breached this Agreement shall be at the sole discretion of the Fraud Section.  If the Fraud Section determines that a public statement by any such person contradicts in whole or in part a statement contained in the Information or the Statement of Facts, the Fraud Section shall so notify the Defendant, and the Defendant may avoid a breach of this Agreement by publicly repudiating such statement(s) within five (5) business days after notification.  The Defendant shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Information and the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or the Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Defendant in the course of any local, state, U.S., or foreign criminal, regulatory, governmental, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant.

28.     The Defendant agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the Fraud Section to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section and the Defendant; and (b) whether the Fraud Section has any objection to the release or statement.

## Complete Agreement

29.     This document states the full extent of the Agreement between the parties.   There are no other promises or agreements, express or implied.   Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

**AGREED:**

**FOR TEVA LLC (RUSSIA):**

Date: 12/22/2016                     By: _____
                                           MARTIN J. WEINSTEIN
                                           WILLKIE FARR & GALLAGHER LLP
                                           ON BEHALF OF
                                           TEVA LLC (RUSSIA)


Date: _____                    By: _____
                                           MARK FILIP
                                           KIRKLAND & ELLIS LLP
                                           ON BEHALF OF
                                           TEVA LLC (RUSSIA)


**FOR THE DEPARTMENT OF JUSTICE:**

                                           ANDREW WEISSMANN
                                           Chief, Fraud Section
                                           Criminal Division
                                           United States Department of Justice


Date: _____                    BY: _____
                                           ROHAN A. VIRGINKAR
                                           JOHN-ALEX ROMANO
                                           Trial Attorneys

20

## Complete Agreement

29.     This document states the full extent of the Agreement between the parties.  There are no other promises or agreements, express or implied.  Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

**AGREED:**

**FOR TEVA LLC (RUSSIA):**

Date: _____          By: _____
                                 MARTIN J. WEINSTEIN
                                 WILLKIE FARR & GALLAGHER LLP
                                 ON BEHALF OF
                                 TEVA LLC (RUSSIA)


Date: 12/22/2016             By: _____
                                 MARK FILIP
                                 KIRKLAND & ELLIS LLP
                                 ON BEHALF OF
                                 TEVA LLC (RUSSIA)


**FOR THE DEPARTMENT OF JUSTICE:**

                                 ANDREW WEISSMANN
                                 Chief, Fraud Section
                                 Criminal Division
                                 United States Department of Justice


Date: 12/22/2016             BY: _____
                                 ROHAN A. VIRGINKAR
                                 JOHN-ALEX ROMANO
                                 Trial Attorneys

20

**EXHIBIT 1**

**CERTIFICATE OF CORPORATE RESOLUTIONS**

A copy of the executed Certificate of Corporate Resolutions is annexed hereto as "Exhibit 1."

## CERTIFICATE OF CORPORATE RESOLUTIONS

WHEREAS, Teva LLC ("Teva Russia"), as represented by Martin J. Weinstein, Esq., a partner at the law firm Willkie Farr & Gallagher LLP, and Mark Filip, Esq., a partner at the law firm Kirkland & Ellis, LLP, outside counsel for Teva Russia (collectively "Teva Russia Outside Counsel") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") regarding issues relating to the U.S. Foreign Corrupt Practices Act;

WHEREAS, in order to resolve such discussions, it is proposed that Teva Russia enter into a certain Agreement with the Fraud Section;

WHEREAS, the Board of the Managing Director of Teva Pharma, B.V., the sole shareholder of Teva Russia, solely acting on behalf of Teva Russia ("Sole Member") has fully reviewed the terms of this Agreement with Teva Russia Outside Counsel;

WHEREAS, Teva Russia Outside Counsel have fully advised the Sole Member of Teva Russia's rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such Agreement with the Fraud Section;

WHEREAS, no promises or inducements have been made other than those contained in this Agreement and no one has threatened or forced the Sole Member, or any person acknowledging the Agreement on behalf of Teva Russia, in any way to enter into this Agreement, or to authorize Teva Russia Outside Counsel to take actions on its behalf with respect to this Agreement;

WHEREAS, the Sole Member understands the terms of the Agreement and voluntarily agrees to each of its terms; and

WHEREAS, the Sole Member is fully satisfied with Teva Russia Outside Counsel's representation in this matter;

Therefore, it is RESOLVED that:

1.     The Sole Member, as authorized by Teva Pharmaceuticals Industries Ltd. ("Company"), on behalf of Teva Russia (a) acknowledges the filing of the one-count Information charging Teva Russia with one count of conspiracy to violate the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Section 78dd-1, in violation of Title 18, United States Code, Section 371; and (b) waives indictment on such charges and enters into a plea agreement with the Fraud Section;

2.     The Sole Member, as authorized by Company, on behalf of Teva Russia, accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of Teva Russia's rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Southern District of Florida; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Fraud Section prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.     Teva Russia Outside Counsel are hereby each individually authorized, empowered and directed, on behalf of the Sole Member, and as authorized by Company, to

execute and deliver the Plea Agreement on behalf of Teva Russia substantially in such form as

reviewed by the Sole Member and to take any and all actions as may be necessary or appropriate,

including entering the plea in court on behalf of Teva Russia, and to approve the forms, terms or

provisions of any agreement or other documents as may be necessary or appropriate to carry out

and effectuate the purpose and intent of the foregoing resolutions (including execution and

delivery of any such agreement or document and to appear in court to enter the plea on behalf of

Teva Russia and any related proceedings).


Date: 15 December 2016          By: _____

                                    BIBIANNE BON
                                    CORPORATE SECRETARY
                                    SOLE MEMBER OF TEVA LLC (RUSSIA)

**CERTIFICATE OF COUNSEL**

The undersigned are outside counsel for Teva LLC (Russia) (the "Defendant") in the matter covered by the plea agreement between the Defendant and the United States of America, by and through the Department of Justice, Criminal Division, Fraud Section. In connection with such representation, the undersigned have examined relevant documents and have discussed the terms of this Agreement with the Sole Member of the Defendant. Based on our review of the foregoing materials and discussions, we are of the opinion that the undersigned have been duly authorized by the Sole Member of the Defendant to enter into this Agreement on behalf of the Defendant and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Defendant and is a valid and binding obligation of the Defendant.

The undersigned have carefully reviewed the terms of this Agreement with the Sole Member of the Defendant and have fully advised the Sole Member of the rights of the Defendant, including of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To our knowledge, the decision of the Defendant to enter into this Agreement, based on the authorization of the Sole Member, granted through its General Members Meeting, is an informed and voluntary one.

Date: 12/22/2016

By: _____
MARTIN J. WEINSTEIN
WILLKIE FARR & GALLAGHER LLP

MARK FILIP
KIRKLAND & ELLIS LLP
Counsel for Teva LLC (Russia)

## CERTIFICATE OF COUNSEL

The undersigned are outside counsel for Teva LLC (Russia) (the "Defendant") in the matter covered by the plea agreement between the Defendant and the United States of America, by and through the Department of Justice, Criminal Division, Fraud Section. In connection with such representation, the undersigned have examined relevant documents and have discussed the terms of this Agreement with the Sole Member of the Defendant. Based on our review of the foregoing materials and discussions, we are of the opinion that the undersigned have been duly authorized by the Sole Member of the Defendant to enter into this Agreement on behalf of the Defendant and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Defendant and is a valid and binding obligation of the Defendant.

The undersigned have carefully reviewed the terms of this Agreement with the Sole Member of the Defendant and have fully advised the Sole Member of the rights of the Defendant, including of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To our knowledge, the decision of the Defendant to enter into this Agreement, based on the authorization of the Sole Member, granted through its General Members Meeting, is an informed and voluntary one.

Date: 12/22/2016

By: _____
MARTIN J. WEINSTEIN
WILLKIE FARR & GALLAGHER LLP

MARK FILIP
KIRKLAND & ELLIS LLP
Counsel for Teva LLC (Russia)

**EXHIBIT 2**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Plea

Agreement between the United States Department of Justice, Criminal Division, Fraud Section

(the "Fraud Section") and Teva LLC (Russia) ("Teva Russia" or the "Company"), and the parties

hereby agree and stipulate that the following information is true and accurate. Certain of the

facts herein are based on information obtained from third parties by the Fraud Section through its

investigation and provided to the Company. Teva Russia admits, accepts, and acknowledges that

it is responsible for the acts of its officers, directors, employees, and agents as set forth below.

Had this matter proceeded to trial, Teva Russia acknowledges that the Fraud Section would have

proven beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth

in the criminal Information:

**The Foreign Corrupt Practices Act**

1.      The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States

Code, Sections 78dd-1, et seq. ("FCPA"), was enacted by Congress for the purpose of, among

other things, making it unlawful to act corruptly in furtherance of an offer, promise,

authorization, or payment of money or anything of value, directly or indirectly, to a foreign

official for the purpose of obtaining or retaining business for, or directing business to, any

person.

**Relevant Entities and Individuals**

2.      Teva Pharmaceutical Industries Ltd. ("Teva") was an Israeli limited liability

company with its headquarters in Petah Tikva, Israel. Teva was the world's largest manufacturer

of generic pharmaceutical products. Teva also manufactured patented pharmaceutical products,

1

including Copaxone, which was used in the treatment of multiple sclerosis. Teva owned and controlled numerous consolidated subsidiaries through which it marketed and sold pharmaceutical products in various countries around the world. Teva's American Depository Receipts ("ADRs") were traded on the Nasdaq National Market from October 1987 until May 2012, when Teva's ADRs began to be traded on the New York Stock Exchange ("NYSE"). Accordingly, since October 1987, Teva has been an "issuer" as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-1(a) and 78m(b).

3.     Teva LLC ("Teva Russia") was a limited liability company incorporated in the Russian Federation in 2010 and was a wholly-owned subsidiary of Teva. Teva Russia, and its predecessor entities, operated on behalf, for the benefit, and under the control of Teva, and was principally responsible for the sale and marketing of Teva pharmaceutical products in Russia. Teva Russia was an "agent" of an issuer, Teva, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

4.     Teva International Group ("TIG") was a unit of Teva that was principally responsible for overseeing Teva's operations in regions outside of the United States and Western Europe, including in the Russian Federation. TIG was in operation from in or about 2002 until in or about mid-2010, at which point Teva underwent a corporate reorganization and TIG's responsibilities were absorbed by other Teva units.

5.     "Teva Executive," an Israeli citizen whose identity is known to the United States and the Company, was the senior Teva executive responsible for overseeing TIG between 2002 and 2010, and left the Company in 2014. Teva Executive was an "officer," "director," "employee," and "agent" of an issuer, Teva, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

6. "Teva Russia Executive," a citizen of the Russian Federation whose identity is known to the United States and the Company, was a high-level executive at Teva Russia from in or about January 2006 until he left Teva Russia in or about September 2012. Teva Russia Executive was an "agent" of an issuer, Teva, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

7. "Russian Official," a citizen of the Russian Federation whose identity is known to the United States and the Company, was a high-ranking government official in the Russian Federation, who held official positions on government committees. By virtue of his official position, Russian Official had the ability to influence matters related to the purchase of pharmaceutical products by the Russian government, including purchases made during annual auctions held by the Russian Ministry of Health. Russian Official was a "foreign official" within the meaning of the FCPA, Title 15, United States Code, 78dd-1(f)(1)(A).

8. "Russian Company" was a group of companies incorporated in the Russian Federation, the identity of which is known to the United States and the Company. Russian Company was a distributor, manufacturer and re-packager of pharmaceutical products in the Russian Federation. Russian Company was owned, controlled and managed by Russian Official. From at least in or about 2003 until at least 2013, Russian Company's controlling shares were held in the name of Russian Official's spouse, who was not involved in Russian Company's business operations.

### Background on Teva Pharmaceutical Sales in the Russian Federation

9. The manufacture, registration, distribution, sale and prescription of pharmaceuticals were highly-regulated activities throughout the world. Countries typically established regulatory schemes that required, among other things, the registration of

3

pharmaceuticals. In certain countries, including the Russian Federation, government entities were responsible for selecting which pharmaceuticals would be purchased by government institutions or ministries and for approving which pharmaceuticals would be eligible for government reimbursement.

10.    Copaxone was the brand-name of glatiramer acetate, a drug used in the treatment of multiple sclerosis, and was one of the few non-generic products sold by Teva. A yearly prescription of Copaxone, which patients were required to take as a once-daily injection, cost up to tens of thousands of dollars. During the relevant time period, Copaxone was Teva's most profitable product.

11.    The Russian Federation had a socialized public healthcare system that provided universal healthcare to Russian citizens, with the cost of medical care and drug treatments shared between the central, regional and local governments. In or around late 2007, the Ministry of Health designated seven illnesses and conditions as rare and expensive to treat and created a program whereby the central government would procure and supply to patients the necessary medications for treating these illnesses and conditions. Among the covered illnesses was multiple sclerosis and treatment by Copaxone. Since in or around 2008, Russian government purchases of Copaxone were primarily made by the Ministry of Health at usually bi-annual auctions.

**The Unlawful Schemes**

12.    From 2006 through at least 2012, Teva, through its employees and agents, together with others, agreed that Teva would make corrupt payments to Russian Official, intending that Russian Official would use his official position and ability to influence the Russian government to purchase Copaxone through tender offers. The payments were made

4

through the high profit margins that Russian Company earned as Teva's repackager and distributor of Copaxone for sales to the Russian Ministry of Health pursuant to the central government's drug purchase program.

13.     In furtherance of the scheme in Russia, employees and agents of Teva sent emails through the United States.

14.     Employees of Teva, based in Israel, and employees of Teva Russia, at the direction of Teva Executive and others, sought to increase sales of Copaxone to the Russian government, including by doing business with companies owned and controlled by Russian Official, knowing that he was a high-level Russian government official at the time.

15.     On or about October 26, 2006, Teva Russia Executive emailed Teva Executive and another senior TIG Manager about a recent meeting with Russian Official, providing them with "an idea of the caliber of the person [by] citing below just a few of his formal titles and personal achievements."[1] Teva Russia Executive described Russian Official's official position and explained that Russian Official was "the key lobbyist of pharma-related questions and issues" as well as a "key contact person for Knesset," the Israeli parliament. Teva Russia Executive explained that Russian Official was the "owner of the local wholesaling company [Russian Company]" along with several other pharmaceutical companies. Teva Russia Executive's email further noted that Russian Official's "influence in the industry" could benefit Teva by, among other things, allowing Teva to obtain "more speedy and straightforward registration of products." Teva Russia Executive cautioned, however, that "the results [of

---

[1] Unless bracketed, all quotations appear as in the original document without corrections or indications of misspellings or typographical errors.

5

Russia's] 2008 presidential elections can affect the status and scope of [Russian Official]'s influence."

16.     On or about October 26, 2006, Teva Executive replied to Teva Russia Executive that he "support[ed] exploring any kind of initiative which could strengthen our position in Russia."

17.     On or about February 8, 2008, Teva Russia Executive sent Teva Executive an email attaching a report about Russian Company.  In a section of the report detailing Russian Company's "management and corporate governance," Teva Russia Executive explained that "[t]ransparency of [Russian Company] should be considered low....  Participation of [Russian Official] and probably some local government officials in the ownership structure is well-known."

18.     In or about early October 2008, Teva managers, including Teva Executive, met with Russian Official and a Russian Company executive in Israel.  The meeting had been arranged by Russian Company's Director of Sales and Marketing.

19.     On or about October 7, 2008, Russian Company's Director of Sales and Marketing emailed Teva Executive to follow-up on matters discussed during the meeting.  The email reiterated that Russian Company was "interested to participate in the delivery and distribution of Copaxone," and explained that the Russian government had already "defined" the government's order for Copaxone for 2009.  The email also mentioned possible "future scenarios" that could affect the "decision making" related to Copaxone sales, reminded Teva Executive that Russian Official had had "personal involvement … in the introduction of Copaxone and other important healthcare initiatives in Russia," and explained that "it will be

beneficial for Teva to grant the distribution of Copaxone to [Russian Company] in full or partially."

20. Between in or around October 2008 and in or around January 2009, Teva employees, including Teva Executive, learned that the Russian Company executive was under investigation in Russia for corruption and that Teva's risk insurance provider had decided to stop insuring transactions with Russian Company.

21. In or around late 2008 or early 2009, after the meeting and email described in Paragraphs 18 and 19, Teva Executive, Teva Russia Executive, and others agreed that Teva would grant Russian Company the right to distribute Copaxone in Russia, intending that Russian Official would use his official position and ability to influence to increase sales of Copaxone to the Russian government. From early 2009 until in or about mid-2010, Teva employees explored various possibilities for Russian Company to sell Copaxone.

22. On or about March 7, 2009, Russian Company's Director of Sales and Marketing emailed Teva Executive with information about a public tender for the purchase of Copaxone that had been announced by the Russian Academy of Medical Sciences ("RAMS"). The email explained that Russian Company's "top management has first hand relations with RAMS" and that the tender offered "a very good chance to push further up Copaxone positioning in Russia, since RAMS and its President have [a] significant role in influencing the opinion of medical and political stratum in Russia."

23. On or about March 8, 2009, Teva Executive forwarded the foregoing email to a senior TIG executive with the note, "[t]his is an interesting offer as this is [Russian Official]'s domain/specialty. Pls look into this and advise soonest."

7

24.     On or about March 10, 2009, the senior TIG executive forwarded Teva Executive's email to Teva Russia Executive, who confirmed that Russian Company had "a strong position in this establishment." Teva Russia Executive explained that he was aware of the issue and was already dealing with a Russian Company employee who "reports directly to [Russian Official]." In or around mid-2009, the Russian government announced a new strategy for the Russian Federation's domestic pharmaceutical industry, known as "Pharma 2020." The goals of the new strategy involved, among other things, an import phase-out and changes to the procurement of pharmaceutical products, primarily by establishing a preference for domestic products. These changes started to apply in early 2009 and affected purchases made through the Russian government's annual procurement auction program. Under the law, as announced, repackaging of a foreign pharmaceutical product inside the Russian Federation could qualify for the domestic preference under Pharma 2020.

25.     In or around mid-2010, Teva reorganized its business and eliminated the TIG business unit. Teva Russia was put under the newly-created EMIA business unit.

26.     In or around mid-2010, Teva Russia employees, including Teva Russia Executive, agreed with Russian Official and others on a plan for Russian Company to be Teva's repackager and distributor for Copaxone sales to the Russian government. Russian Company would repackage and distribute Copaxone on behalf of Teva. As set forth below, Teva hoped that Russian Official would use his political network and official influence to benefit Teva to support maintaining or increasing the amount of Copaxone sold to the Russian government.

27.     In or around early August 2010, a Russian Company employee emailed Teva Russia Executive to request that Russian Company receive a larger discount on sales to a Russian government customer. On or about August 5, 2010, Teva Russia Executive forwarded

the complaint to the manager of Teva Russia's Innovative Business Unit, requesting that Russian Company be granted a larger discount. The Teva Russia manager opposed giving Russian Company "any additional concessions," but Teva Russia Executive wrote back, suggesting that Teva Russia should consider the request as "the cost of building a relationship with [Russian Official]," as "this year, there was a substantial increase in the Copaxone requests from the [RAMS]," and Teva Russia "may benefit from [Russian Official's] support in other areas as well."

28. In or around late August 2010, Teva Russia employees provided a draft of the proposed Copaxone repackaging and distribution agreement between Teva and Russian Company to Teva employees in Israel.

29. On or about September 12, 2010, a Teva Russia executive emailed the Finance Director for Teva's Copaxone business unit and other Teva managers and executives in Israel to provide the "rationale for the new scheme of Copaxone business in Russia." The email explained that "this year the Russian Government has been contining to interfere into pharmaceutical market functioning. Thus it has been continuing its pressure on prices especially on those products that being of high price are paid by the state budget." The email further explained that the focus of this price pressure had been "expensive imported products paid by the government," including Copaxone, and that the Russian government was seeking to "encourage[] competition intensification by both fast track registration of the new competing products (one was registered this summer for MS treatment and we expect it takes part in the MS tender this fall) and supporting fast development and introduction of the local glatiramoids (they call them, of course, 'Copaxone's generics')." In the email, the Teva Russia executive stated that this "and some other new factors produced a serious threats for the Copaxone business in 2011."

9

As a result, "partnership with a robust influential local player was identified as the proper solution to the above challenges." The email stated that the partner was "supposed to lobby Copaxone in the state tender." He explained that Russian Company "was found as the right company capable to assure keeping Copaxone's share and its price and even r[a]ising them both up."

30.     In his email to Teva executives, the Teva Russia executive asked for their approval of the proposed Russian Company repackaging and distribution agreement "as soon as possible." The email explained that "if we do not have the supply agreement approved and signed by [the] mid[dle] of this week we will encounter very real threat of losing a 100 million USD Copaxone business in 2011."

31.     On or about September 12, 2010, a Teva Russia manager emailed Teva executives in Israel with additional information supporting Teva Russia's request. The email noted that Russian Company was headed by Russian Official, listed Russian Official's official positions on various government committees, and explained that "the plan" was to use Russian Official's contacts, including at the Ministry of Health, to maintain Copaxone's share of the market, including by minimizing the risk that a generic version of Copaxone would be approved by the Russian government, thereby reducing Teva's market share.

32.     On or about September 12 and 13, 2010, Teva Russia Executive sent emails to senior Teva executives in Israel requesting them to sign off on the agreement with Russian Company immediately.

33.     On or about September 14, 2010, a Teva Russia senior manager emailed Teva Russia Executive and described a meeting he had just had with Russian Official. The email said that Russian Official had told him that the Minister of Health "had returned from a vacation and

10

asked in the morning if there was a confirmation that the entire project ... would take place."
The email explained that Russian Official was concerned that Teva would refuse to approve the
agreement with Russian Company, and that Russian Official had threatened that "both the price
and the supply volumes would be purposefully 'lowered' if a partnership with him was not
established."

34.     On or about September 15, 2010, Teva executives agreed to enter into the
Copaxone repackaging and distribution agreement with Russian Company.

35.     On or about October 7, 2010, Teva Russia's Legal Director initiated the internal
process to formally enter into the agreement with Russian Company. Consistent with Teva's
anti-corruption policy as it related to third-party agreements, the Legal Director submitted a
completed questionnaire about the Russian Company agreement to Teva for review and
approval. In transmitting the materials, the Legal Director stated that the "deal value is about
US$ 100 million for 2011 sales" and asked for immediate review, calling the deal "rather
urgent." The email and supporting information stated that Russian Official's wife was the owner
of the company but did not include that Russian Official ran the business. The email also
omitted facts known to Teva Russia Executive and other Teva Russia employees, including
details about the corruption investigation by Russian authorities against the Russian Company
executive and information from Russian news media reports on Russian Official's alleged
involvement in corruption related to Russian government drug procurement auctions going back
to 2006.

36.     On or about October 8, 2010, a Teva Finance Department manager with
responsibility for approving compliance-related requests for the EMIA region directed a Finance
employee to forward the compliance questionnaire concerning the Russian Company agreement

11

to the Regional Compliance Officer and to Teva Russia's CFO for, among other things, due diligence to be conducted.

37.     On or about October 9, 2010, in response to an inquiry about the status of due diligence on Russian Company, a senior EMIA executive sent an email to another high-ranking EMIA executive explaining that Teva Russia Executive would be leading the due diligence process.  As set forth above, at the time, Teva Russia Executive had been pushing for the agreement between Teva Russia and Russian Company.

38.     On or about October 21, 2010, the EMIA Regional Compliance Officer approved the agreement between Teva and Russian Company.

39.     On or about October 28, 2010, Teva executed the framework agreement with Russian Company, which included granting Russian Company the right to repackage and distribute Copaxone in the Russian Federation as well as an incentive agreement with payments tied to increasing sales targets.  At the same time Teva entered into the distribution agreement with Russian Company, Teva terminated an agreement with the Russian company that had distributed Copaxone at several prior Ministry of Health auctions and agreed to pay that company a substantial "bonus" payment as part of the termination.

40.     On or about November 12, 2010, the Russian Ministry of Health awarded Russian Company the contract to supply the Russian government with glatiramer acetate for its tender.

41.     On or about December 13, 2010, a Teva Russia executive communicated via email with a senior manager at Russian Company regarding matters related to the recently-awarded contract to supply Copaxone to the Russian government.

42.     On or about December 30, 2010, Teva Russia Executive emailed a senior EMIA executive about a meeting the executive was scheduled to have with Russian Official.  In

12

preparing the executive for the meeting, Teva Russia Executive explained Russian Official's position and influence in the Russian government and stated that the "state channel is a key one for his businesses." Teva Russia Executive explained that "the dilemma [Russian Official] faces is how to protect his positions under conditions when state funded business in Russia is becoming transparent." Among other things, Teva Russia Executive asked the senior EMIA executive to "push [Russian Official] to demand more funding for Copaxone [] in early 2011" and to "obtain his commitment in protecting Copaxone (access to the Minister [of Health] and [Ministry of Health] decision makers, leveraging Senate capabilities)."

43.    On or about January 2, 2011, the senior EMIA executive emailed Teva Russia Executive about his meeting with Russian Official, stating that Russian Official "strongly encourages us to strengthen our influence with Regional Government Neurologist Representatives, to ensure in the future Copaxone volumes are protected."

44.    On or about January 24, 2012, Russian Company was awarded another contract by the Russian Ministry of Health to supply the government with Copaxone.

45.    Teva terminated its repackaging and distribution relationship with Russian Official and Russian Company in the middle of 2013 as a result of Russian Company's refusal to follow Teva's due diligence procedures.

46.    During the time that Russian Company was Teva's repackager and distributor for Copaxone, Teva earned profits of approximately $204,167,303 on sales made by Russian Company to the Russian government.

13